HENRY PAUL BLANCO, Appellant, Claimant Below, v. KENT GENERAL HOSPITAL, *Appellee*, Employer Below.

(*April* 11, 1963.)

LYNCH, J., sitting.

*Frank J. Gentile, Jr.,* for Appellant.

F*lanzer* and *Isaacs* for Appellee.

Superior Court for New Castle County, No. 180, Civil Action, 1961.

LYNCH, Judge.

This is an appeal from an award made by the Industrial Accident Board. Appellant Blanco, the appellant here, was the claimant[1] below and Kent General Hospital[2], the appellee here was the employer below.

The appeal is from a *nunc pro tunc* award and order of the Board made on January 25, 1961, terminating Appellant's compensation as of August 24, 1957; in short, a retroactive award.

Blanco worked as a male nurse in various hospitals from 1945 until the time of his accident on November 21, 1956 on premises of the Employer. He never lost time from work in this period and he never had occasion to consult a doctor except for "colds and stuff like that". Claimant comes from Tampa, Florida, where his family lives. He had been working for Employer over three years at the time of the injury and was making $200.00 per month plus one meal per day.

---

[1]Appellant will be referred to hereafter as Claimant.
[2]Appellee will be referred to hereafter as Employer.

On November 21, 1956, he was working in the emergency room. While at work Claimant grabbed the side of a stretcher to prevent a patient from falling therefrom and in doing so he felt a severe pain in the lower part of his back. It developed he had sustained a ruptured disc. He was hospitalized for a period of four to five weeks in a Wilmington Hospital, during which period a spinal fusion and laminectomy was performed on Claimant by Dr. Theodore Strange, an orthopedic surgeon. After his release from the hospital Claimant continued to see Dr. Strange once a week for some time.

On December 11, 1956, a written compensation agreement was entered into by Claimant and Employer through Employer's compensation carrier, calling for payment of compensation in the amount of $33.15 per week, beginning December 2, 1956,[3] and continuing "until terminated in accordance with the provisions of the Workmen's Compensation Law of the State of Delaware". This agreement was approved by the Board on December 27, 1956.

Claimant returned to work at his Employer's premises on January 28, 1957, but he was unable to do his regular job and so he was put to work in the office doing odd jobs. He had to be shown his office duties. He testified he had had a 10th grade education and that he had had no education for office work. After a while he was assigned to his regular job in the emergency room, but since this job required lifting and bending over he says he just couldn't do it because of the pain in his spine and legs, and hence he quit his work on July 5, 1957.

Compensation payments had been discontinued when Blanco returned to work—this without agreement or order

---

[3]It does not appear why this date was fixed as the starting date, see Title 19 *Del. C.* § 2321, considered post as pages 12-13. This should be checked by Claimant and the Board.

of the Board—but payments were resumed when he left his work on July 5, 1957, and they continued until August 23, 1957, on which date the Employer unilaterally discontinued them, without obtaining an agreement with Claimant or an order from the Industrial Accident Board. Claimant has received no compensation since that time.

On January 27, 1960, the Employer petitioned the Board to review the original compensation agreement, contending that Claimant's disability had terminated on August 23, 1957. A hearing on Employer's petition was held on December 16, 1960. After the hearing, the Board—on January 25, 1961—found as a fact (1) that Claimant sustained "a personal injury arising out of and in the course of his employment * * *" to-wit: a dislocated disc, caused when he grabbed side of stretcher to prevent patient from falling; (2) an agreement as to compensation was entered into on December 11, 1956, providing for payment of compensation of $33.15 per week and that "said compensation shall be payable * * * until terminated in accordance with the provisions of the Workmen's Compensation Law"; (3) that compensation was paid "for temporary total disability from December 2, 1956 through January 27, 1957, and again from July 5, 1957 through August 23, 1857"; (4) that in the period from January 28, 1957 through July 4, 1957 Claimant did office work for the Employer "with no loss of wages" and (5) that competent medical testimony "* * * established that [Claimant] could return to his regular employment as of August 24, 1957".

 The Board ruled as a matter of law that the Employer was "authorized and directed to terminate compensation payments \* \* \* as of August 23, 1957,—in effect this was a retroactive award[4].

An appeal was taken by Claimant. Appellant has briefed and argued two questions:

1. The Board Had No Authority to Make Its Ruling Retroactive.

2. There Is No Evidence to Support A Finding That Claimant's Condition Has Changed.

___

[4]*Nunc pro tunc* orders or judgments are discussed in 49 C.J.S.—Judgments—§§ 117-121; see also 30-A Am.Jur.—Judgments—§§ 591/612. It is stated 49 C.J.S. page 246:

"\* \* \* the object or purpose, and office, function, or province, of a nunc pro tunc entry are to make the record speak the truth by recording or correctly evidencing an act done or judgment rendered by the court at a former time and not carried into the record, or not properly or adequately recorded. It is not the object, office, or province of such an entry to alter a judgment actually rendered, or to correct an erroneous decision or judgment; and, generally speaking, *the object or office of the entry is* only to supply matters of evidence or to correct clerical misprisions, and *not to supply omitted judicial action;* \* \* \*." (Emphasis supplied) It is stated, 49 C.J.S. page 247 that:

"There is an inherent common-law power in the courts, independent of any statute, to cause the entry of judgments nunc pro tunc in proper cases and in furtherance of justice. This power belongs to all courts of record, and includes appellate courts \* \* \*." Then, in 49 C.J.S. at page 249 it is stated:

"The power of the court to enter judgment nunc pro tunc should be used sparingly and only when the right of the moving party to ask it is clear; *relief by entry nunc pro tunc will not be granted where the failure to enter the judgment at the proper time was due to the party's own carelessness or negligence.* \* \* \*" (Emphasis supplied)

A retroactive award by an Administrative Agency bears a resemblance to a *nunc pro tunc* judgment or order of a court. Since Administrative Agencies are generally creatures of statute they have no inherent power to act as courts may as in the nature of a *nunc pro tunc* order or judgment; their power must be given by statute. See discussion, post p. 280. In light of the foregoing statements of legal principles as they pertain to judgments or orders *nunc pro tunc,* the Court should be convinced that a statute grants the power to enter a *nunc pro tunc* order or make a retroactive award before upholding one.

Appellee has, in its brief, joined in presentation of these two questions and has argued them. Appellant's point 1 will be considered first.

Appellant, in support of this point, cites and relies on the statement appearing in 101 C.J.S. Workmen's Compensation § 852b, page 199, that

"Generally speaking, an award may not be modified or terminated retroactively. * * *"
and the Arizona case cited in the footnote, *Hamlin v. Industrial Commission*, 77 Ariz. 100, 267 P.2d 736 (1954). More is stated on the cited page in the cited volume of Corpus Juris Secundum, viz.:

"* * *. However where statutory authority therefor exists, subject to limitations contained therein, a change may be made retroactive, * * *."

Appellee, on the other hand, relies on the opinion of the Supreme Court of Errors of Connecticut, in *Morisi v. Ansonia Mfg. Co.*, 108 Conn. 31, 142 A. 393 (1928).

Appellant would distinguish this case by citation of this language, appearing in the cited case, 142 A. at page 395.

*"Whether or not the facts of a particular case would justify the exercise of the power (to make a retroactive award) must largely rest in the discretion of the commissioner.* Orderly procedure and the desirability of definitely settling the rights of the parties would seem to require that, as soon as practicable after an employer or insurer has ascertained that incapacity has ceased, an application should be made for a modification of the award, and, if such an application is delayed, relief should not as a matter of course be granted as of the date of the cessation of the incapacity, but only if, in view of the circumstances of the particular case, equity and justice can best be done in that

way. We cannot anticipate what conclusion the commissioner would reach in the case now before us." (Emphasis supplied)

The Connecticut Court had previously observed in its opinion, 142 A. at page 394, and this must be read in connection with the holding:

"The powers of compensation commissioners are wholly the creation of the statute, and our inquiry must be as to the intent of the Legislature in the provisions it has made as to the revision of awards. These are found in section 5355 of the General Statutes, and the particular clause here involved is that one which states that an award or voluntary agreement as to compensation shall be subject to modification upon the request of either party whenever[5] it shall appear to the commissioner that the incapacity of the employee has increased, decreased, or ceased. * * *"

The statement is to be found in 100 C.J.S. Workmen's Compensation § 379b that:

"* * * [c]ompensation boards and commissions are generally considered to be administrative bodies, * * *. Such boards and commissions generally act in an administrative capacity, and constitute a part of the executive branch or department of the state government, * * *."

At 100 C.J.S. Workmen's Compensation § 383, page 139 it is stated:

"A workmen's compensation board or commission is a tribunal with special or limited jurisdiction, having such jurisdiction as is conferred on it by constitutional provision or by statute; and its jurisdiction is only such as is conferred on it by express law, or such as may be conferred by necessary implication."

---

[5]See Title 19 *Del. C.* § 2347, discussed post, page 282.

See also Vol. 12, Schneider, Workmen's Compensation, Perm. Ed., § 2440; 73 C.J.S. Public Administrative Bodies and Procedure §§ 48, 49 and 50 and 42 Am.Jur. Public Administrative Law §§ 25 and 26.

In *Diamond State Liquors, Inc. v. Delaware Liquor Commission,* this Court recognized and adopted the foregoing principles, as are discussed in the cited treatises, 6 Terry 412, 420, 75 A.2d 248, 253 (1950). It was ruled in the cited case on the pages cited:

"In this connection, it must be remembered that the Liquor Commission is an administrative body and *has no powers other than those conferred upon it by the statute by which it was created. * * *"* (Emphasis supplied)

The Arizona Court had in the Hamlin case, 267 P.2d at page 738, said that an award "is res judicata and binding on both the Commission and the petitioner [the employee]" and once an award is made, it cannot be changed until "changed by a different judicial interpretation". The Arizona Court held that the Industrial Commission's award, being retroactive in operation, was void, and was to be set aside. It is clear that the Arizona Court based its holding on its interpretation of the Arizona law.

In effect then it becomes necessary for this Court to examine and analyze our Workmen's Compensation Statute to determine what express powers were vested by the General Assembly in the Industrial Accident Board and if it can be said that it has any implied powers—to make a retroactive award.

 Rights and obligations of employers[6] and employees[6] with respect to injuries occurring at work and

---

[6]When these terms are used herein, it necessarily applies only to the extent our law is applicable.

compensation benefits payable as a consequence are wholly covered by statute in this state. Title 19 *Del. C.* § 2304 binds every employer and employee, adult and minor, to "the provisions of 'the Act', to pay and accept compensation for personal injury or death by accident arising out of and in the course of employment, regardless of * * * negligence and to the exclusion of all other rights and remedies".

The pertinent statutory provisions demonstrating the power of the Industrial Accident Board in workmen's compensation causes and the procedure to be followed in making, modifying and terminating awards for compensable injuries or physical conditions subject to our Act are to be found in Title 19 *Del. C.* Chapters 21 and 23.

Delaware has a Board consisting of three members, Title 19 *Del. C.* § 2101. A majority of the Board constitutes a quorum for the exercise of any of the powers or authority conferred on the Board by our statute, and an award by a majority of the Board is valid, 19 *Del. C.* §2103. Title 19 *Del. C.* § 2121, grants the Board "jurisdiction of all cases" arising under the Act, and directs "[i]t shall hear disputes as to compensation to be paid * * *"; it is given power to "make its own rules of procedure for carrying out the provisions" of the Act, and it is given power to "compel the attendance of witnesses". If a person "disobeys or resists any lawful order or process, or misbehaves during a hearing * * *, neglects to produce [documents or evidence] after having been ordered to do so * * *, refuses to take the oath as a witness, or after having taken the oath, refuses to be examined * * *", Title 19 *Del. C.* § 2123 directs that "the Board shall certify the facts * * * to any Judge of the Superior Court" who, after hearing the evidence finds the facts "so warrant" shall "punish such person in the same manner * * * as for a contempt committed before the Superior Court."

The Board is empowered, Title 19 *Del. C.* § 2124, to "appoint a disinterested and duly qualified physician to make any necessary medical examination of the employee, and testify in respect thereto * * *," and it is empowered, Title 19 *Del. C.* § 2126, to approve the "[f]ees of attorneys and physicians for services" related to claims. An employer or an employee cannot, by any "agreement, rule, regulation or other device", relieve one or the other "in whole or in part from any liability created by" the Act "except as specified" in the Act. Title 19 *Del. C.* § 2305. Each employer is required to "keep a record of all injuries, fatal or otherwise, received by his employees in the course of their employment", and "a report [of an accident] shall be made by the employer to the Board" within "10 days after knowledge" of the accident comes to the attention of the employer. Similarly "[u]pon the termination of the disability of the injured employee," the employer is required to "make a supplemental report", Title 19 *Del. C.* § 2313.

The Act requires the Board to provide these report forms and specifies the information the employer is required to furnish the Board thereon.

Title 19 *Del. C.* § 2341, provides that unless an "employer has actual knowledge of the occurrence of the injury, or unless the employee or someone in his behalf, * * * gives notice to the employer within 90 days" of the accident, "no compensation shall be due until such notice is given or knowledge obtained".

If an employee suffers "a compensable occupational disease" the employer is not obligated, Title 19 *Del. C.* § 2342, to pay compensation "[u]nless the employer during the continuance of the employment has actual knowledge" of the disease, "or unless the employee or someone in his behalf * * * gives the employer written notice or

claim" of the disease, "which notice to be effective shall be given within a period of six months after the date on which the employee first acquired such knowledge * * *".

The Act excludes the employer from any duty to pay compensation benefits for incapacity of an employee to work for 3 days, or less, Title 19, *Del. C.* § 2321. If, however, the incapacity extends "for a seven day period, [or if there is an] amputation [of a member of the body or a part thereof] or [if there is] hospitalization", and if any one of these conditions intervene "the employee shall not be excluded from receiving compensation for the first three days of incapacity".

The Board is empowered by Title 19 *Del. C.* § 2343 to order an employee to submit himself for physical examination by a physician selected by the employer and refusal of an employee to submit himself to the examination "shall deprive him of the right to compensation * * * during the continuance of such refusal * * *".

An employee's right to be paid compensation can be recognized by agreement, Title 19 *Del. C.* § 2344, and "a memorandum of such agreement signed by the parties in interest, shall be filed with the Board, and if approved by it, shall be final and binding unless modified as provided in section 2347 of this title. * * *"

If the parties "fail to reach an agreement in regard to compensation * * * either party may notify the Board * * *", Title 19 *Del. C.* § 2345. This section directs the Board in such circumstances to give notice of a hearing and then "hear and determine the matter in accordance with the facts and the law, and state its conclusion of fact and rulings of law."

Title 19 *Del. C.* § 2348 provides, among other things, that:

"(a) In all hearings before the Board, it shall make such inquiries and investigations as it deems necessary. * * * each award of the Board shall be in writing * * * and a copy * * * served * * * or sent * * * to, each of the parties in interest * * *."

Title 19 *Del. C.* § 2349 provides that "[a]n award of the Board in the absence of fraud shall be final and conclusive between the parties" unless an appeal is taken to the Superior Court.

The pertinent portions of Title 19 *Del. C.* § 2347 now (this has been effective since 1955) provides:

"On the application of any party in interest on the ground that the incapacity of the injured employee has subsequently terminated, increased, diminished or recurred, or that the status of the dependent has changed, the Board may at any time, but not oftener than once in 6 months, review any agreement or award.

\* \* \* \* \* \*

*"Compensation payable to an employee,* under the provisions of this chapter, *shall not terminate until and unless the Board enters an award ending the payment of compensation after a hearing* upon review of an agreement or award, provided that no petition for review, hearing or an order by the Board shall be necessary to terminate compensation where the parties to an award or an agreement consent to the termination.

· \* \* \* \* \* \*

*"After the filing of a petition for review the compensation payable to an employee shall be paid by the employer to the Board.* The Board shall retain the funds so paid until it enters an order upon the petition for review, after which it shall reimburse the employer or turn over the funds to the employee in accordance with the terms of the order." (Emphasis supplied)

The foregoing review of all the statutory provisions show exactly what express powers were granted to the Board, and the statutory provisions which set up the procedure for the determination and payment of benefits. It demonstrates very clearly that the Board has been given no express power to make and enter a retroactive award—except to the extent provided in Title 19 *Del. C.* § 2347; it appears clearly that the employer did not file a petition to review until January 27, 1960, and even then did not continue making payments of the benefits to the Board, hence it cannot invoke that provision of the Act.

Moreover, I find no section or sections which impliedly granted the Board any wide range of discretion in the administration of the Act; the Act precisely provides when and what benefits are payable and in what amounts.

*Diamond State Liquors, Inc. v. Del. Liquor Commission, supra,* in substance spoke of finding the powers of an administrative agency in "the statute"; this Court, however, does not read that opinion as limiting powers to such an agency solely to a grant of an express statutory grant of power, although at 6 Terry 421, 75 A.2d 253, the Court did use that terminology. Nonetheless the Court can find nothing in any section or sections of the law, singly or collectively, implying any powers over and above what is provided expressly in the statute, and specifically from which this Court would be authorized to imply any grant of power to the Board to make a retroactive award. The Court, therefore, holds the award to be invalid, and of no legal force or effect.

As appears in footnote 4, pages 279 et seq., discussing a Court's entry of *nunc pro tunc* orders, such an order is not used "to supply omitted judicial action" or "where the failure * * * was due to the party's own carelessness or negligence", supra p. 279. The fact is obvious here that

the Employer or its carrier wholly failed to seek permitted relief under Title 19 *Del. C.* § 2347 for over 2 years after payments of compensation were curtailed. This failure cannot give the Board power to order a retroactive award, even if a Court could find a basis to order a retroactive award; the delay, or neglect here is such that even a Court might not be justified to grant *nunc pro tunc* relief.

I might add—wholly for emphasis—so that my holding is clear to all, that at no time after the parties here entered into the agreement (see page 279, supra) could the Employer fail, neglect or refuse to pay the Claimant, the benefits to which he was entitled "until * * * the Board" entered "an award ending the payment of compensation" —and this only "after a hearing upon review of" the agreement. That necessarily means compensation was due and payable at all times after the legally effective date of the agreement *"until"* the Board modified the terms of the agreement.

The Employer has argued that Title 19 *Del. C.* § 2324, which fixes the rate to be paid a claimant when there is a total disability, provides that "Nothing in this section shall require the payment of compensation after disability ceases"; that Title 19 *Del. C.* § 2325, which fixes the rate to be paid during partial disability, specifies that it shall be paid "during the period of such partial disability for work"; and that Title 19 *Del. C.* § 2347, permits a petition for modification no oftener than once every six months.

It is contended by Employer that the six month limitation (discussed supra) is "manifestly unjust" in cases where a disability ceases within that period and the claimant refuses to agree to termination of payment. Employer urges that in some cases a disability might cease within the six month period, and yet the carrier might be compelled to continue compensation payments if the Employee

refuses to agree to termination even though the disability has ceased. The Employer has overlooked the 1955 amendment to Section 2347 of the Act, permitting filing of a petition to review, but requiring Employer to make payments continuously, such payments to be made to the Board, and it never utilized the available procedure of review, Title 19 *Del. C.* § 2347. Employer suggests that the way to remedy a problem, such as it contends exists here, would be for the carrier simply to stop payments (even though the award requires the payments to continue until the award is modified) and later obtain a retroactive modification ratifying the carrier's clear violation of the statutes. There may have been a factual basis on which to premise such an argument of "inequity or unjustness"—but as the Court has heretofore pointed out—the Employer never filed a petition to review when and if, in fact, it ascertained Claimant could resume performance of the regular duties of his employment.

It is, on the other hand, very logically argued by Claimant's attorney that in imposing the six month limitation on review of awards the General Assembly intended to prevent parties from harassing the Board with repeated petitions for modification. The General Assembly seemingly considered that this purpose was sufficiently important to justify the hardship which might result in the few cases in which there was a change in disability during the six month period following the making of an award. Obviously, the hardship can fall upon an employee as well as upon the carrier, since it is just as possible that it will cease or diminish, or it may increase.

In either event, it is a hardship which the statute seemingly recognized but the General Assembly has not attempted to rectify, and which problem certainly cannot be rectified by one party or the other acting in a clear defiance of the clearly expressed provisions of the law and of

the award in the hope that it can obtain justification of the action by a retroactive award. If there is to be relief from the claimed hardship then it is for the General Assembly to make the desired change. One thing is certain—neither the Board nor this Court can take any course in the administration of our Act except as authorized by the General Assembly. Under our Constitution that body makes the law; the Executive Department (and this means the Board here) carries out the law as made by the General Assembly and this Court can only see to it that the law is carried out as it is written and within the intent of the General Assembly.

The Court can only conclude that the Board had no authority to make its ruling retroactive, and the cause is reversed on that ground.

The Court next considers Claimant's second point— that there is no evidence to support a finding that Claimant's condition has changed.

██ ██ Candor requires that the Court note it is unable to comprehend the basis of the Board's Finding of Fact No. 5, made in its award of January 25, 1961—

"That competent medical testimony presented * * * established that Henry P. Blanco could return to his regular employment as of August 24, 1957."

There is no medical evidence in the record to sustain any such finding and it was without warrant. Three doctors gave testimony; *not one testified* that Claimant "could return to his regular employment"; two evinced doubt if he had fully recovered from his operation; and all stated there was some partial permanent residue. Since the Employer was here seeking to modify the terms of the award made by the agreement, the burden of establishing that the award should be modified was on Employer; it was

required to show by a preponderance of competent evidence that Claimant's condition had changed, so as to justify the award being modified, *C. F. Braun & Co. v. Mason,* 3 Storey 279, 168 A.2d 105 (Sup.Ct.1961).

Certainly in light of Mr. Justice Wolcott's statements, in speaking for an unamimous Court, in that case, serious doubt exists as to any real showing by Employer of any real improvement of Claimant's condition as of the date of the hearing, and this is discussed later (post, p. 287) in a review of the medical testimony. It is possible—perhaps probable—that some question exists if the fusion performed on Claimant has remained solid; Claimant may need further medical attention. True it is that he has had some recovery, but even here the medical evidence in the case differs as to the extent of his recovery. All the medical evidence points to the existence of some permanent residue. The facts seem to demonstrate Claimant still was unable to resume performance of the duties of his regular employment. A brief review of what each doctor had to say will illustrate this.

Dr. Walter Bailey, a highly regarded orthopedic surgeon practicing in Wilmington testified at the hearing on behalf of the Employer. The pertinent part of his testimony is as follows:

"Q What was your prognosis about his condition, Doctor?

"A *I thought that the patient had had difficulty with his back from time to time.* Judging from the physical examination, I couldn't find any real evidence of nerve root damage, in that his reflexes were present and active and there was no wasting or atrophy, and his muscle strength was good. I thought that possibly that his situation was not quite as bad as maybe he said it was. *I thought that he had, however, a definite disability.*

"Q And to what extent would you say this disability exists?

"A I thought it would be in the vicinity of 25 to 30 per cent of his spine.

"Q What about his entire physical being, Doctor?

"A I thought that to be 10 to 15 per cent of his body.

"Q Doctor, in your opinion, then, from your examination, of Mr. Blanco, would you say this man is capable of doing any kind of work at the present time?

"A Would I think there are jobs he can do? I think I have noted here that *I didn't think he could do jobs that would require repeated bending or lifting or pushing over head or something like that.*

"Q But could he go to work and engage in moderate work not requiring excessive strain?

"A I would think so." (Emphasis supplied.)

While it is possible that Claimant is physically able to do some work, which does not require physical exertion, it appears clearly that he is not educationally qualified for anything other than physical work.

Dr. Bailey's further testimony is quite revealing—

"Q Would you say that as of June 29, 1960, he was unable to perform the duties of a male nurse?

"A If he were expected to lift patients and so forth, yes, I think so."

At the time he was giving testimony Dr. Bailey says that Claimant might "get in trouble" doing all the duties customarily required of a male nurse, and he does not know whether hospitals would be willing to employ Blanco as a male nurse.

Dr. Maxwell is an orthopedic surgeon, practicing in Tampa, Florida; he gave testimony he had examined Claimant on August 19, 1957, and again on August 14, 1959. Dr. Maxwell's testimony can be summarized in this language:

* * * "At that time [August 1959] I felt that the findings on this examination were essentially the same as those found on my examination done on August 19, 1957. *At that time I was of the opinion that he was making a very satisfactory recovery, and I felt that he could return to light duty at that time, but should avoid heavy lifting* for three or four months. From the findings on the present examination, I was unable to understand why this patient could not return to some kind of work. *I did not feel that any further treatment was indicated at this time and was of the opinion that he has a permanent partial impairment not to exceed 10 per cent of the body.*" (Emphasis supplied.)

Dr. Trupp is a neuro-surgeon, practicing in Tampa. He testified that he examined Claimant there on December 13, 1957, and gave the following conclusions as of that time:

"* * * *The findings suggest this patient who has had adequate relief of his ruptured intervertebral disc, appears now to be having some discomforts related possibly to the spinal fusion. The findings suggest the spinal fusion may be encroaching on the elements in the spinal canal, placing these elements, especially the nerve roots, in tension.* The X-rays of the lumbosacral spine should be made in standing, weight-bearing positions to determine if there has been any shifting of the fusion or any loss of stability. *This patient should not engage in bending or lifting, nor should he return to work until resolution of his discomforts occurs.* I am placing him on Flrxin, ti. ti. d. with meals." (Emphasis supplied.)

After examining Claimant on March 16, 1959 Dr. Trupp gave the following conclusions:

"This patient has not returned to work. He has had heat in the form of diathermy to the low back. He has also had some injections at the Gonzales Clinic by Dr. Perez. He finds that the lumbosacral support is beneficial. He is quite uncomfortable when it is off. Patient continues to experience low back discomfort with radiation into the left sciatic distribution. *I recommend that his file be closed on the basis of a 20 per cent partial permanent disability rating of the body as a whole.* He may take Robaxin or Flexin from time to time for his discomforts. *He should avoid unusual heavy lifting and bending. He should continue to wear his lumbosacral support. He should attempt to find employment which does not require unusual heavy lifting or bending.* (Emphasis supplied)

It is not to be overlooked that Dr. Bailey testified before the Board that he had examined Claimant shortly before the hearing, including taking of X-rays, and his testimony (Tr. 59) is as follows: (the hearing was held December 16, 1960)

Q Doctor, you said when the fusion has been established; did I understand you said that you felt there was some movement there?

"A From his X-rays I thought the fusion was not completely solid.

"Q Was not completely established, you mean?

"A Yes, it takes about six months for it to get that way. The only way I would know now to be certain, to be frank, is simply to look. I don't know any other way I could tell you. You would have to open it up and look at it to see if it was solid or not.

"Q But you felt it wasn't?

"A *I think there is a possibility it might not be solid.*

"Q That was as of June 29 [1960]?

"A Yes." (Emphasis supplied)

In light of this entirely uncontradicted medical testimony, the Board has no evidence before it justifying its Finding No. 5—see supra at p. 279. This is only another reason why the award must be reversed and remanded.

When the Board takes the case for further consideration it can and should determine if Claimant has had all the recovery that can be expected, or if something more has to be done about the fusion of the disc. If the Board determines there has been as much recovery as can be expected from that, then it should find the amount of temporary total disability payments which are due and owning to Claimant and order payment at least up to the date of the Board's award. If it appears that Claimant has a permanent partial disability the Board should then determine the extent thereof and make an award based on its findings of such partial permanent disability, if any, and then close the case.

This is only by way of suggestion; there is no disposition on the part of the Court to intrude into the province of the Board: it is by law charged with administration of the "Act" and no reference to these suggestions are to be recited in the order of reversal. The Board is charged by law with administering the law. On the otherhand, it does seem clear that Claimant has not received from the Board the proper treatment the law affords him and the Court, by way of suggestion only, has called these matters to the attention of the Board.

An Order may be presented effectuating the opinions herein expressed.